# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 2, 2014

## STATE OF TENNESSEE v. ANTHONY WELLS

### Appeal from the Criminal Court for Shelby County
### No. 11-02210      Chris Craft, Judge

### No. W2014-00185-CCA-R3-CD  - Filed March 13, 2015

The defendant, Anthony Wells, appeals his Shelby County Criminal Court jury conviction of voluntary manslaughter, claiming that the evidence was insufficient to support his conviction, that the sentence imposed by the trial court was excessive, and that the trial court erred by refusing to admit certain hearsay statements. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR., and ROGER A. PAGE, JJ., joined.

Charles S. Mitchell, Memphis, Tennessee, for the appellant, Anthony Wells.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

In November 2011, the Shelby County Criminal Court grand jury charged the defendant with one count of first degree murder arising out of the stabbing death of the victim, John Carter. The trial court conducted a jury trial in September 2013.

The State's proof at trial showed that on the afternoon of May 14, 2011, the defendant's former girlfriend, Toya Murphy, picked him up at a residence on Gainesville in Memphis. After a shopping expedition, Ms. Murphy and the defendant returned to Ms. Murphy's residence at the Kingsgate Apartments where they, along with Ms. Murphy's brothers, Tavarus and Coby, spent the evening drinking alcohol and socializing.

Just before 11:00 p.m., the victim arrived, and Ms. Murphy's older brother, Corey Ward, arrived shortly thereafter. At trial, Ms. Murphy explained that she had known the victim for many years and that he was "like a brother" to her. Later that evening or early the following morning, Tavarus and Coby left, and Ms. Murphy determined that she had consumed too much alcohol; she retired to her bedroom to go to sleep. Sometime later, Mr. Ward, the defendant, and the victim entered Ms. Murphy's bedroom, and the victim began jumping on Ms. Murphy's bed. Ms. Murphy instructed the men to leave, and they complied.

The men returned to the living room, and the defendant and the victim began to argue. According to Mr. Ward, the argument involved the color of a cast that one of Ms. Murphy's daughters once had. The argument escalated as the defendant and the victim raised their voices and cursed at each other. Mr. Ward attempted to intervene, but the argument continued. Ms. Murphy overheard the defendant and the victim arguing, and as she started out of her bedroom, she encountered the defendant in the hallway. He informed her that the victim was out of control and needed to leave; according to Mr. Ward, the defendant told Ms. Murphy to make the victim leave "before he do something to him." Ms. Murphy entered the living room and asked the victim what was the cause of the commotion. The victim then told the defendant, "[Y]ou make me leave." Mr. Ward testified that both the defendant and the victim began making calls on their cellular telephones and that, when they completed their calls, the argument continued.

Ms. Murphy testified that she did not know what the argument was about and that it lasted a "good twenty minutes." She reminded the men that her younger brother, Brandon, was asleep in his bedroom, which prompted the victim to walk outside with Mr. Ward. Mr. Ward recalled that the victim stated, "I'll get out of here, but I'm not leaving." Mr. Ward estimated that he and the victim stood outside of the apartment near the parking lot for four to five minutes. The defendant then walked outside, and the defendant and the victim resumed their argument. The defendant and the victim began pushing each other. Mr. Ward stepped between the two men, informing them that they were drunk and needed to stop fighting. Angered, the victim slapped a beer bottle out of Mr. Ward's hand, insisting that he was not intoxicated. The defendant began yelling at Mr. Ward that the victim was not his friend. Mr. Ward instructed the defendant to return to the apartment, and the defendant eventually complied.

Mr. Ward encouraged the victim to calm down and leave. Two to three minutes later, the defendant reappeared outside. Mr. Ward was seated on a landing by the sidewalk, and the victim was standing in front of him. According to Mr. Ward, the defendant walked straight to the victim. Mr. Ward believed that the two men were "swinging at each other," but Mr. Ward then heard the victim cry out, "[H]ey, man. This man got a knife, he's sticking me." Mr. Ward grabbed the defendant by the shoulders, and the defendant attempted

-2-

to throw off Mr. Ward. At that point, the knife the defendant was wielding broke, and the blade fell to the ground; the defendant was still holding the handle. The defendant stated, "I told him, I told him, he's going to send me back to jail," and the defendant then returned to Ms. Murphy's apartment.

Meanwhile, Ms. Murphy was in the process of dressing herself and preparing to drive the defendant home. As she was leaving her bedroom, she encountered the defendant walking from the kitchen, and he demanded that Ms. Murphy drive him home immediately. Ms. Murphy noticed that one of the defendant's hands was by his side, and she saw "something black that was curved, looked like the handle of a knife." They left the apartment, and as they approached the parking lot, Ms. Murphy saw the victim lying on the sidewalk. She did not notice any blood, so she believed that the victim and the defendant had engaged in a fight. Startled, she stopped to look at the victim, and the defendant stated, "I said now, b****." Ms. Murphy and the defendant then got into her vehicle, and she drove out of the apartment complex.

As they were driving away, Ms. Murphy asked the defendant what had transpired. The defendant replied, "I told him, man, I told him, man." Ms. Murphy passed a police car and expressed that she should stop the officer, but the defendant demanded that she continue driving. The defendant accused Ms. Murphy of having a romantic relationship with the victim, and Ms. Murphy categorically denied the accusation. When she arrived at the Gainesville residence, she asked the defendant if she could come inside to use the restroom. While she was in the restroom, she overheard the defendant, who was using his cellular telephone, exclaim, "He ain't dead." When she exited the bathroom, the defendant told her, "They said he was dead." Ms. Murphy hurried out of the house and into her vehicle, quickly locking the doors. The defendant attempted to open the car door, but she refused to unlock it, and she drove away.

When she arrived at the Kingsgate Apartments, she informed Memphis Police Department ("MPD") Officer Jonathan Bond where he could find the defendant. MPD Officer Eddrick Williams responded to a call to proceed to a Gainesville address to locate a suspect in a recent stabbing. When Officer Williams and other officers arrived at the address, Officer Williams proceeded to the front door. Peeking through the blinds, he noticed a person, later identified as the defendant, reclining on a sofa. When Officer Williams knocked on the door, the defendant immediately walked to the rear of the house. A woman answered the door, and Officer Williams asked for the man he had just seen on the sofa. Just then, Officer Williams saw the defendant "tiptoeing by going toward the back . . . act[ing] like we didn't see him walking by." The defendant was arrested without incident. Officer Williams noticed nothing unusual about the defendant's gait as he was walking him to his squad car.

-3-

MPD Officer Christopher Sanders assisted in processing the crime scene at the Kingsgate Apartments. Officer Sanders photographed a knife blade and a knife handle near the victim's body; each item was a few feet from but on opposite sides of the victim's body. Officer Sanders also photographed a small knife which was located in the parking lot and a broken beer bottle near the body of the victim. Ms. Murphy confirmed that the small knife found in the parking lot resembled the steak knives that she owned and kept in a kitchen drawer inside her apartment.

Doctor Karen Chancellor, chief medical examiner for Shelby County, testified that Doctor Miguel Leboy had performed the victim's autopsy, but because Doctor Leboy was unable to attend the trial, Doctor Chancellor had reviewed the records and photographs related to the autopsy and was prepared to testify. Doctor Chancellor explained that the victim primarily sustained internal rather than external bleeding from his stab wounds, resulting in over two liters of blood collecting inside the left side of his chest. Doctor Chancellor opined that the fatal stab wound to the victim entered the left side of his chest, cutting his left lung, his heart, and his pulmonary artery, causing him to "ble[e]d to death inside." In addition, the victim sustained multiple sharp and blunt force injuries, which "may have contributed to death." Doctor Chancellor testified that the manner of death was homicide. In addition, she stated that the victim had a blood alcohol content of .23 at the time of his death.

Doctor Chancellor also reviewed the defendant's medical records from a visit to the hospital on May 15. The defendant's x-rays revealed a broken bone near his smallest toe on his left foot. The defendant was discharged from the hospital on the evening of May 15, and his discharge papers noted only a "left fifth metatarsal fracture."

With this evidence, the State rested. Following the trial court's denial of the defendant's motion for judgment of acquittal and a *Momon*[1] colloquy, the defendant chose to present proof. MPD Sergeant Joe Starks testified that he spoke with the defendant on May 15 following his discharge from the hospital and that the defendant was seated in a wheelchair and had a cast on his leg. Sergeant Starks did not observe any other injuries. Justin Terry testified that he was the defendant's cousin and that he had received two telephone calls from the defendant in the early morning hours of May 15, 2011. As a result of those telephone calls, Mr. Terry attempted to find a ride for the defendant.

The defendant testified that he had been a friend of the victim's and Ms. Murphy's brothers. The defendant also stated that he had maintained a friendship with Ms. Murphy even after the two had stopped dating.

---

[1]*See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn. 1999).

According to the defendant, the victim was very intoxicated on the evening of May 14 and was behaving in a very aggressive manner. After Ms. Murphy had gone to bed, the victim asked the defendant if he was planning to engage in sexual relations with Ms. Murphy. The defendant said no and explained that he and Ms. Murphy were only friends. The victim then declared that he intended to have sexual intercourse with Ms. Murphy, and he walked to Ms. Murphy's bedroom; neither Mr. Ward nor the defendant followed him. A few minutes later, the victim returned to the living room; the defendant described the victim as being very angry and confrontational. The victim exclaimed that he had known Ms. Murphy and her family much longer than the defendant had, and the victim demanded to know the color of the cast worn by one of Ms. Murphy's daughters.

The defendant testified that, initially, he was agreeing with the victim but that once the victim began cursing and calling him names, he stood up and began cursing the victim. The defendant recalled that Mr. Ward did not get involved, believing that the situation between the defendant and victim was amusing.

The defendant walked to Ms. Murphy's bedroom and asked her to drive him home, but she did not get out of bed. The defendant called his nephew to ask for a ride, but his nephew was unable to help. The victim then entered Ms. Murphy's bedroom, "still angry, still just cursing me out and still calling me names and then he started threatening my life saying that he was going to kill me." The defendant stood up from Ms. Murphy's bed where he had been seated, and the victim pushed the defendant's forehead with "quite a little bit of force." The defendant left the bedroom and walked to the kitchen to place a call to Mr. Terry. The victim followed the defendant into the kitchen and continued to taunt and threaten him. Mr. Ward finally convinced the victim to walk outside. At that time, the defendant "grabbed a knife out of the [kitchen] drawer" and "stuck it in [his] pocket real quick."

The defendant hurried to Ms. Murphy's bedroom and urged her to lock the door, but Ms. Murphy refused to lock her brother out of the apartment. The defendant then heard the sound of a bottle breaking, and he heard the victim state, "'Let me go back in the house and I'm fixing to kill this m*****f*****." The defendant panicked and decided to attempt to leave the apartment on his own.

When he walked outside, he noticed the victim had pushed Mr. Ward against a wall and was accusing Mr. Ward of siding with the defendant. The defendant held up his hands to the two men indicating he was leaving. The victim then pushed the defendant off the landing, injuring the defendant's foot. As the defendant was attempting to regain his balance, the victim began "pounding" on him with "so much force," threatening to kill him and attempting to force the defendant onto the ground. The defendant grabbed the knife

from his pocket and stabbed the victim, "just trying to get him to stop." The defendant could not recall how many times he stabbed the victim, claiming that he was only "trying to protect" himself and that he was not attempting to kill the victim.

When the victim released the defendant, the defendant did not continue his attack. Because of the injury to his leg, he hopped into Ms. Murphy's apartment, crying and insisting that she drive him home.

Based on this evidence, the jury convicted the defendant of the lesser included offense of voluntary manslaughter. Following a sentencing hearing, the trial court sentenced the defendant as a multiple offender to a term of 10 years' incarceration to be served consecutively to his sentence in another case "and any other parole time."

Following the denial of his timely motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant contends that the trial court erred by excluding testimony of statements he made to police officers following his arrest, that the evidence was insufficient to support his conviction of voluntary manslaughter, and that the sentence imposed was excessive. We consider each claim in turn.

*I. Hearsay Testimony*

The defendant contends that the trial court erred by excluding the testimony of MPD Officer James Graham regarding the defendant's statements immediately following his arrest. We disagree.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise provided by law." *Id.* 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of the inadmissibility of hearsay.

In the instant case, the defendant sought admission of statements he made to Officer Graham via the excited utterance exception to the hearsay rule embodied at Tennessee Rule of Evidence 803(2), which provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is "not excluded by the hearsay rule." Tenn. R. Evid. 803(2). Three requirements must be met before a statement qualifies for admission pursuant to this hearsay exception:

The first requirement is "a startling event or condition" that

"suspend[s] the normal, reflective thought processes of the declarant." Second, the statement must "relate to" the startling event or condition. This broad requirement offers "considerable leeway" such that "the statement may describe all or part of the event or condition, or deal with the effect or impact of that event or condition." The third and final requirement dictates that the declarant make the statement while "under the stress or excitement from the event or condition." This requirement considers a variety of factors, including the interval of time between the startling event and the statement.

*State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (citations omitted). Our supreme court has stated that the "'ultimate test'" of admissibility via the excited utterance exception is "'spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement or strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication.'" *Id.* (quoting *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993)).

In this case, the trial court allowed Officer Graham to testify outside the presence of the jury. Officer Graham stated that, while leading the defendant to the patrol car following his arrest, the defendant exclaimed "'self-defense'" several times and claimed that "'[t]he man was trying to kick my eyeballs out.'" After listening to Officer Graham's testimony, the trial court concluded that the defendant's statements were not admissible under the excited utterance exception because the statements were made "under the stress of the arrest not under the stress of the event." The trial court found that the defendant's statements were part of a "thought out plan" that were "made for purposes of litigation" and were therefore unreliable.

The record supports the ruling of the trial court. The defendant's claims of self-defense were not made immediately after his stabbing of the victim at the Kingsgate Apartments; rather, they were made later that same morning outside the defendant's residence to a police officer immediately following the defendant's *arrest* for the victim's murder. Given the time that had elapsed and the fact that the defendant, through an earlier telephone call, had already learned of the victim's death, the defendant's self-serving statements were not so spontaneous as to "preclude the idea of deliberation and fabrication." *Smith*, 857 S.W.2d at 9. Accordingly, we conclude that the trial court did not err by excluding the defendant's hearsay statement.

-7-

*II. Sufficiency*

The defendant contends, first, that the trial court erred by denying his motion for judgment of acquittal because the evidence was insufficient to support a finding of voluntary manslaughter, and second, that the evidence adduced at trial was insufficient to support his conviction. We disagree.

A trial judge may direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See* Tenn. R. Crim. P. 29(a); *see generally Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). The standard by which the trial court determines a motion for judgment of acquittal at that time is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). That is, "whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[f]irst degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202. "Voluntary manslaughter is the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." *Id.* § 39-13-211(a).

Initially, we note that the defendant chose to offer proof following the trial court's denial of his motion for judgment of acquittal at the close of the State's proof. As such, he has waived his right to appeal the denial of his motion. *See Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007) (declining to revisit the waiver rule promulgated in *State v.*

*Mathis*, 590 S.W.2d 449, 453 (Tenn. 1979)); *see also State v. Johnson*, 762 S.W.2d 110, 121 (Tenn. 1988); *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998). Accordingly, our review of the sufficiency of the evidence is not based solely on the evidence offered during the State's case-in-chief but also necessarily includes the proof offered by the defendant.

Here, the proof adduced at trial established that, in the early morning hours of May 15, 2011, the defendant and the victim began a heated argument that quickly escalated to cursing and name-calling. Although we do not know the extent of the defendant's level of intoxication, the victim's autopsy revealed that his blood-alcohol content was nearly three times the legal limit at the time of his death. The defendant demanded that Ms. Murphy force the victim to leave the apartment "before [the defendant] do something to him." Ms. Murphy refused but urged the men to cease their arguing. Mr. Ward was eventually successful in convincing the victim to exit the apartment, and Mr. Ward spent four to five minutes outside with the victim before the defendant walked outside and resumed his argument with the victim. Mr. Ward intervened when the men began shoving each other, prompting the victim to slap a beer bottle out of Mr. Ward's hand in anger. The defendant angrily informed Mr. Ward that the victim was not Mr. Ward's friend and was disrespecting him. The defendant then retreated to Ms. Murphy's apartment.

A few minutes later, the defendant returned and walked straight to the victim, and, according to Mr. Ward, the defendant and the victim began swinging at each other. A moment later, Mr. Ward heard the victim cry out that the defendant had a knife and was stabbing him. Mr. Ward grabbed the defendant by the shoulders, but the defendant tried to throw off Mr. Ward. At that point, the knife the defendant was wielding broke, and the blade fell to the ground. While still gripping the knife's handle, the defendant exclaimed, "I told him, I told him, he's going to send me back to jail."

The defendant walked inside Ms. Murphy's apartment. When Ms. Murphy saw the defendant, he was visibly angry, and he demanded that Ms. Murphy take him home immediately. Ms. Murphy saw what appeared to be a knife handle without a blade in the defendant's hand. As they walked past the victim lying outside on the sidewalk, Ms. Murphy stopped momentarily, and the defendant insisted, "I said now, b****." When she arrived at the defendant's residence, she overheard the defendant speaking to someone on his cellular telephone. Following his conversation, the defendant turned to Ms. Murphy and stated, "[T]hey said he was dead."

The victim's autopsy revealed his cause of death to be "multiple sharp force injury and blunt force injuries," and the manner of death to be homicide. The defendant's medical records revealed a fracture to a small bone in his foot.

Although the defendant testified that he acted in self-defense, "[i]t is the jury's province, as the trier of fact, to determine which parts of the testimony and evidence to credit, and there is no requirement that a jury must wholly accept or reject a witness's account of events." *State v. Gene Shelton Rucker, Jr.*, No. E2002-02101-CCA-R3-CD, slip op. at 6 (Tenn. Crim. App., Knoxville, Dec. 9, 2004) (citing *State v. Bolin*, 922 S.W.2d 870, 876 (Tenn. 1996)).

Affording the State the strongest legitimate view of the evidence and deferring to the credibility determinations made by the jury, we conclude that the defendant's decision to seek out the unarmed victim while he himself was armed with a knife and while the victim had removed himself from the defendant and the argument demonstrated an intent to kill the victim, and, accordingly, the evidence strongly supports the defendant's conviction of voluntary manslaughter.

### *III. Sentencing*

Finally, the defendant contends that the trial court improperly imposed a top-of-the-range sentence for his conviction and failed to apply any mitigating factors. The State counters that the record fully supports the trial court's sentencing decision. Following our review, we agree with the State.

At the defendant's sentencing hearing, the State presented proof that the defendant was on probation when he committed the instant offense and that the defendant had four prior felony convictions. The defendant admitted that he had been placed on probation a mere three days prior to his stabbing of the victim. The defendant urged the trial court to consider mitigating factors, which included the defendant's acting under strong provocation and justification of the defendant's conduct without establishment of a defense. *See* T.C.A. § 40-35-113(2), (3).

Upon consideration of all relevant sentencing principles, the trial court found the defendant to be a Range II, multiple offender, and the trial court specifically found that the defendant had acted intentionally in killing the victim. The trial court found four enhancement factors: that the defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range; that the defendant had previously failed to comply with conditions of a sentence involving release into the community; that the defendant possessed a deadly weapon during the commission of the crime; and that the defendant had committed the instant felony while released on probation. *See* T.C.A. § 40-35-114(1), (8), (9), (13). After considering the proposed mitigating factors, the trial court concluded that the jury had considered mitigation by convicting the defendant of the lesser included offense of voluntary manslaughter. The trial court's findings resulted

in its imposing the maximum sentence of 10 years to be served in incarceration.

Our standard of review of the trial court's sentencing determinations in this case is whether the trial court abused its discretion, but we apply a "presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant . . . in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise* at 706 n.41 (citing T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id*. at 709.

In the instant case, the record reflects that the trial court considered all relevant sentencing principles, including the evidence adduced at trial and at the sentencing hearing, the presentence report, the nature and characteristics of the conduct, enhancing and mitigating factors, statistical information provided by the Administrative Office of the Courts, the defendant's statement and statements from the victim's family, and the defendant's low potential for rehabilitation. *See* T.C.A. § 40-35-210(b); § 40-35-103(5). As a Class C felony for a Range II, multiple offender, the conviction for voluntary manslaughter is sanctioned by a sentencing range of a minimum of six years and a maximum of 10 years. *See* T.C.A. § 40-35-112(b)(3). The trial court found four enhancement factors to be applicable and rejected the proposed mitigating factors. "A trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). For this reason, an appellate court is precluded from reweighing appropriately applied enhancement and mitigating factors. *See id.* at 344-45. Accordingly, we find no error in the trial court's refusal to find the presence of any mitigating factors.

Moreover, the record further reflects that the trial court based its sentencing decision on the considerations set forth in Code section 40-35-103, finding that measures less restrictive than confinement had been attempted without success and that placing the defendant on probation would depreciate the seriousness of his offense. *See* T.C.A. § 40-35-103(1)(B)&(C), (5). Taking all of this into consideration, we hold that the trial court did not abuse its discretion by sentencing the defendant to 10 years' incarceration, and we conclude that the record supports the length of sentence imposed in this case.

*IV.  Conclusion*

The trial court did not err by excluding the defendant's self-serving hearsay statements, the evidence adduced at trial is sufficient to support the defendant's conviction, and the trial court did not err in sentencing the defendant.  Accordingly, we affirm the judgment of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE